## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-108 (DLF)** |
| **NARAYANA RHEINER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Narayana Rheiner to 21 months' incarceration, a term of supervised release of 3 years, restitution in the amount of $2,000, and a special assessment of $100.

The Government's recommended sentence – at the midpoint of the 18 to 24 month guideline range calculated by the United States Probation Office ("USPO") – takes account of aggravating factors that distinguish this case from less serious violations of 18 U.S.C. § 231(a)(3), while also reflecting Rheiner's early acceptance of responsibility.[1]

---

[1]   As discussed below, the Guilty Plea Agreement stated that Rheiner's Estimated Criminal History Category was I, and that based on this, the Estimated Guideline Range was 8 to 14 months. However, the Guilty Plea Agreement also provided that "[Rheiner] acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding [Rheiner's] criminal convictions and/or criminal history points may be reached and [Rheiner's] criminal history points may increase or decrease." That has happened here. The USPO calculated that Rheiner's Criminal History Category is IV, resulting in a 18 to 24 month sentencing guideline range. The government concurs with this calculation.

1

# I.      INTRODUCTION

The defendant, Narayana Rheiner, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[2]

Rheiner, is a 41-year-old male with a history of arrests and convictions for various offenses.

On January 6, 2021, while on probation in Maryland, Rheiner traveled from Baltimore to Washington by himself. At approximately 2:15 p.m., Rheiner was on the South side of the Upper West Plaza at the front of a violent mob that was attempting to breach the U.S. Capitol. Rheiner told other rioters to "push up" against the police line, and he pushed forward until he made physical contact with police officers. Rheiner grabbed a police officer's riot shield and attempted to pull it out of the officer's hands. Rehiner and the officer struggled for control of the shield, until Rheiner pulled the shield away, causing the officer to fall down several steps to the ground. This violent and disruptive act contributed to the mob overrunning the police line and breaking into the Capitol.

At approximately 2:44 p.m., Rheiner entered the Capitol building through the Upper West Terrace door. At approximately 2:50 p.m., Rheiner was part of a group rioters near the Old Senate Chamber that attempted to move farther into the Capitol through a corridor that was guarded by a group of Metropolitan Police Department ("MPD") officers.   Rheiner joined other rioters in

---

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

yelling at the police in an aggressive and threatening manner, and he stepped so close to the police that his body made contact with the body of an officer, and he refused to back up. At about 2:57 p.m., Rheiner left the Capitol building through a broken window next to the Senate Wing door.

On March 2, 2022 federal agents arrested Rheiner in Baltimore, where he lived in a hotel and worked at a pizza shop. After he was released on bond on March 3, 2022, in this case (ECF 7), Rheiner was arrested on state charges, and he is currently incarcerated at the Anne Arundel County Jail in Maryland.

Based on these facts, as explained in greater detail below, the government recommends that the Court sentence Rheiner to 21 months' incarceration, which is at the midpoint of the advisory Guidelines' range of 18 to 24 months for his conviction of violating 18 U.S.C. 231(a)(3) (Civil Disorder). A 21-month sentence reflects the gravity of Rheiner's conduct – he physically obstructed police at a key moment in the riot, in a way that recklessly endangered the safety of an officer, encouraged others to do the same, and subsequently entered the Capitol building, where he continued to aggressively interfere with and obstruct the police – but the recommended sentence also acknowledges his early admission of guilt and personal circumstances.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of
the Capitol Grounds***

As noted in the above-referenced Statement of Offense, Rheiner's actions began on the
Upper West Plaza of the Capitol, a location in which numerous assaults against law enforcement
officers and disruptions of their attempts to stop the rioters from advancing made possible the
rioters' entry into the United States Capitol Building on January 6, 2021.

Initiated by the most fervent groups and individuals within the crowd and hiding in the
anonymity of the mob, each action helped the crowd penetrate further into the United States
Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were
at risk. The physical breaches of the building can therefore be traced directly back to the assaultive
and disrupted conduct on the grounds of the West Front.

At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of
the crowd jumping over and pushing down the bicycle-rack barricades at the Peace Circle and
advancing into the restricted area to engage with USCP officers at the first manned barrier. Less
than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police
officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters
had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the
second manned police barrier. They flooded the Lower West Plaza Area, pushing against the
barricade there.

For the next hour and a half, a growing number of police officers were faced with an even
faster growing number of rioters in the restricted area, the two sides fighting over the establishment
and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

4

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of
weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figures 1 through 4: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). The bottom right photo shows the nearly completed bicycle rack barrier line as of 1:39 p.m., which was later completely overrun.*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the
crowd began to grow even more rapidly, supplemented by those who had walked the mile and a
half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers
responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It
began with two blaring tones, and then a 30-second announcement, which was played on a
continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately. This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members

of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

As described in greater detail below, Rheiner was part of this mob.   He was at the front of the crowd, near the southern end of the police line, directly confronting the police officers attempting to defend the Capitol, encouraging others to "push up" against them and tearing a riot shield out of an officer's hands. Within minutes of his actions to police line began to break.

By 2:28 p.m., rioters had broken through the police defensive line in several places, creating gaps in the line, and a general retreat was called. With their defensive lines cut off, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.





*Figures 5 through 7: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

**B.**    **Narayana Rheiner's Role in the January 6, 2021 Attack on the Capitol**

***Rheiner Participates in Civil Disorder at the Capitol***

On or about January 6, 2021, Rheiner traveled from Baltimore to Washington, D.C., via automobile. Rheiner attended the "Stop the Steal" rally and then marched with other protestors to the Capitol. At about 2:00 p.m., Rheiner was part of the above-referenced mob that gathered on the Upper West Plaza. Officers from the U.S. Capitol Police and the Metropolitan Police

Department attempted to maintain a police line to prevent the mob from advancing further into the restricted area.

In the photo below, Rheiner is the individual with shoulder length hair and beard, wearing a black jacket and backwards red baseball hat.



*Figure 8: Rheiner yelling for other rioters to "push up" against the police line on the Upper West Plaza*

At approximately 2:04 p.m., Rheiner was in front of the police line. There, he waived other rioters forward toward the police line, yelling that they should "push up" on the line. Numerous rioters were yelling at the police, assaulting them, and attempting to remove metal bike rack barriers. Rheiner advanced forward until his body pushed into police officers, who attempted to push him back.



*Figure 9: this screenshot from Body Worn Camera ("BWC") of an officer on the police line, shows Rheiner using his body to push against police, while several officers attempt to push him back.*

### *Rheiner Grabs Officer's Riot Shield, Dragging him to the Ground*

Police officers used clear plastic shields to defend themselves from strikes of the mob and the numerous projectiles being hurled at them. They also used the shields to block rioters from advancing and to attempt to push them back without resort to more dangerous weapons. Rheiner used both hands to pull a riot shield away from a police officer. He then dragged that officer down several stairs, causing the officer to fall to the ground.

9



*Figure 10: BWC footage showing Rheiner grabbing a police officer's shield with both hands. The stairs that he dragged the officer down can be seen behind him.*



*Figure 10: BWC footage showing Rheiner attempting to pull a plastic shield away from police officers. The police offices' hands can be seen clinging to the shield, as Rheiner attempts to pull it away.*

Rheiner, who weighs approximately 200 pounds, pulled the officer toward him as he moved down the stairs. After a brief tug-a-war, Rheiner pulled the officer down the stairs, causing the officer to fall to the ground, as Rheiner ripped the shield out of his hands.



*Figure 11: Rheiner pulling the shield out of the officer's hands, causing him to fall down the stairs.*



*Figure 12: Rheiner appears to take the shield into the crowd as the fallen officer lays on the ground.*

11

### *Rheiner Illegally Enters the Capitol Building*

Within minutes of Rheiner taking the shield, the mob on the Upper West Plaza reached a violent frenzy, causing the police line defending the Capitol to break. Rioters, including Rheiner, advanced forward, first deeper into the external restricted areas, and then into the Capitol building itself.

Rheiner joined the crowd that climbed the external stairs to the Upper West Terrace. Rheiner can be seen in CCTV footage outside the West Door, while several rioters in the doorway argued with the police officers guarding the door. After several minutes, the police, who were greatly outnumbered and facing an increasingly aggressive crowd, withdrew. At approximately 2:44 p.m., Rheiner entered the Capitol, followed other rioters inside.



*Figure 13: CCTV footage showing Rheiner entering the West Door. Just before he entered, Rheiner can be seen waving for others to go inside.*

Rheiner appears to have moved directly to the Rotunda area, at the center of the Capitol building. In the CCTV still below, he can be seen in the Rotunda with other members of the crowd who have illegally entered the building.



*Figure 13: CCTV footage of Rheiner in the Rotunda*

### Rheiner further Interferes with Law Enforcement Officers near the Old Senate Chamber

Minutes later, at approximately 2:50 p.m., Rheiner proceeded from the Rotunda toward the Old Senate Chamber. Rheiner joined a group of rioters who were attempting to gain access to a hallway that was blocked by a group of MPD officers. Rheiner yelled at the police, "You know how many times I've been sprayed today? That shit ain't nothing! […] You sprayed me right in my face, but that ain't nothing." Among other things, Rheiner yelled "Why don't you just go home!"



*Figure 14: BWC video showing Rheiner yelling at the group of police officers.*

Other rioters yelled at the police officers "you're going to get pushed back eventually" and "we're coming in whether you like it or not," and briefly chanted "stop the steal." Rheiner advanced until he was standing face to face with the officers.   Rheiner said, "We're not backing up!" and "There're millions of people here—it's not worth it. You guys need to join us, be on our side."

14



*Figure 15: Rheiner yelling at police as part of a mob demanding to be let through.*

At one point, Rheiner moved so close to the officers that he made physical contact with an officers, who attempted to push him back with his hand.   Rheiner refused to budge, saying to the police, "You just need to stand down, that's it."



*Figure 15: BWC video of Rheiner moving closer to the officers.*

15



*Figure 16: BWC video showing a police officer's gloved hand attempting to push Rheiner back.*

Several minutes later Rheiner moved away from the area, apparently after realizing that the MPD officers were not going to back down to his intimidation.

At about 2:57 p.m., Rheiner exited the Capitol building through a broken window near the Senate Wing Door.

<div align="center"><em>Rheiner's Statement to Law Enforcement</em></div>

At the time of his arrest, Rheiner gave a statement to the FBI. Rheiner was cooperative, but initially denied that he had entered the Capitol building. Rheiner admitted that he attended the rally on January 6 and later explained that he went to the rally because he believed the election had been stolen and wanted to do something about it.

When an FBI agent told Rheiner that there were numerous videos available from that day, Rheiner admitted that he had gone inside the building.

Rheiner also admitted that he had "grabbed a shield and took it away from an officer." Rheiner claimed he had no intention of hurting the officer. According to Rheiner, he was "acting stupid" and got caught up in "the heat of the moment." Rheiner further explained he had been "egged on" by other people in the crowd including "Antifa members dressed up as Trump supporters."

Rheiner was asked if he had any interactions with law enforcement inside the Capitol. He admitted only that he "talked to" an officer in the Rotunda before leaving the building through a window.

When asked if he regretted his actions, Rheiner said he did, particularly because it "did not help the situation" and made Trump supporters look bad.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 31, 2022, a federal grand jury returned an indictment charging Rheiner with violations of 18 U.S.C. § 231(a)(3) (Civil Disorder), 18 U.S.C. § 1752(a)(1), (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On November 4, 2022, Rheiner was convicted of violating 18 U.S.C. § 231(a)(3) based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Rheiner now faces sentencing for his violation of 18 U.S.C. § 231(a)(3) (Civil Disorder). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office,

Rheiner faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Consistent with the guilty plea agreement, the Probation Office has calculated the Total Offense Level as 11, as follows.

18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **11** |

*See* Plea Agreement at ¶¶ 5(A), PSR ¶¶ 25-34.[3]

The U.S. Probation Office calculated Rheiner's criminal history as category IV, which is not disputed by the Government. PSR ¶ 48.[4] Accordingly, with a Total Offense Level, after

---

[3] Based on the facts and circumstances of Rheiner's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 18-24 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

[4] As noted above, in the plea agreement signed by Rheiner and the Government, Rheiner's estimated criminal history was calculated as Category I. The plea agreement includes the following language: "Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease." Plea Agreement, ¶ 5.B.  The Government does not dispute the Probation Office's

acceptance of responsibility, at 11, and a Criminal History Category of IV, Rheiner's Guidelines imprisonment range is 18 to 24 months' imprisonment. PSR ¶ 87.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a sentence of incarceration at the midrange of the Guidelines or greater.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rheiner's felonious conduct on January 6, 2021 was part of a massive riot undertaken to prevent the certification of the electoral vote. The nature and circumstances of Rheiner's offenses were very serious, and fully support the government's recommended sentence of 21 months incarceration.

Not only was Rheiner part of this larger riot, but he was involved at a critical moment when rioters overran the police line on the West Front, allowing the rioters to penetrate into the building. Without the aggressive and violent behavior of rioters like Rheiner, the police officers likely would have been able to hold the line and prevent the mob from entering the building.

Moreover, while the officer who fell down the stairs was not injured, he easily could have been. In a statement to the FBI, Rheiner claimed he had no intention of hurting the officer. However, Rheiner's actions in engaging in a tug-of-war with the officer, and ultimately causing him to fall down the stairs to the ground, were exceedingly reckless and could have easily injured the officer.

---

calculation.

Rheiner's behavior is particularly troubling because he: (1) advanced to the front of the crowd of rioters directly confronting the police on the Upper West Terrace; (2) encouraged others to "push up" on the police line there; (3) ripped a riot shield out of an officer's hands and apparently took it into the crowd of rioters (4) in so doing, pulled the officer down stairs, causing the officer to fall to the ground; (5) then illegally entered the Capitol building; and (6) joined other rioters in aggressively trying to intimidate police officers near the Rotunda; (7) stood so close to those police officers that he touched them with his body and hand.

### B.  The History and Characteristics of the Defendant

Rheiner, a 41-year-old male who worked at a pizza shop in Baltimore, was living at a hotel at the time he was arrested. Rheiner has a history of criminal arrests and convictions that goes back two decades. That history, according to the PSR, includes:

- In 2003, Rheiner was charged with possession to distribute drugs on three different occasions. Each time, "sufficient facts [were] found" but the case was "continued without guilty finding," and he was placed on probation. PSR ¶¶ 36, 37, 38.

- In 2004, Rheiner was charged with shoplifting. Sufficient facts were found but the case was continued without a finding of guilt, and he was placed on probation. PSR ¶ 39.

- In 2007, Rheiner was convicted of Indecent Exposure.   He was sentenced to three years of incarceration, but the sentence was suspended. PSR ¶ 40.

- In 2007, Rheiner was charged with Driving on a Suspended License. He was given probation before judgment, for a term of one year. PSR ¶ 41.

- In 2007, Rheiner was charged with second-degree assault. The charge was nolle prossed. PSR ¶ 50.

- In 2013, Rheiner was charged with second-degree assault. The charge was nolle prossed. PSR ¶ 51.

- In 2014, Rheiner was charged with Driving on a Suspended License. He was given

probation before judgment, for a term of one year. PSR ¶ 42.

- In 2015, Rheiner was charged with second-degree assault, theft, and attempted theft. The charges were nolle prossed. PSR ¶ 52.

- In 2017, Rheiner was charged with Fourth Degree Burglary. He pled guilty and was given probation before judgment for a term of two years.  Petitions alleging violations of probation were filed.[5] PSR ¶ 43.

- In 2018, Rheiner was charged with Possession of a Controlled Substance other than Marijuana. He received one year of probation before judgment. PSR ¶ 44.

- In 2019, Rheiner was convicted of Attempted Second Degree Burglary. He was accepted into a drug court and received a sentence of five years of probation. In April 2021, a bench warrant was issued, apparently as the result of a drug arrest noted under "Supervision Adjustment" in the PSR at ¶ 45. That warrant was executed in July 2021, but another bench warrant was issued in August 2021. That warrant was executed in March 2022, following Rheiner's arrest and release from custody in this case. In April 2022, he was terminated from Drug Court upon a finding that Drug Court was not successful and sentenced to 3 years' incarceration, all suspended but 321 days, for which he was given credit. Rheiner's probation was subsequently revoked, and he served an additional term of incarceration of 263 days. PSR ¶45.

- On July 20, 2021, Rheiner was arrested for failure to appear after a bench warrant was issued. Rheiner was incarcerated on a violation of probation based on his arrest in this federal case. Rheiner is currently incarcerated at the Ordnance Road Correctional Center, Anne Arundel County jail, Maryland.

    As indicated by this history, Rheiner's crimes on January 6 were not an isolated event in

an otherwise law-abiding life. They came, instead, after a series of previous charges, including

---

[5] It is not clear from the PSR whether a judgment of guilt was ever entered as a result of any of the petitions, and the final notation in the PSR is that the warrant was quashed. Nonetheless, the USPO assigned one point for this case pursuant to U.S.S.G. § 4A1.1(c). That subsection states "Add 1 point for each prior sentence not counted in (a) or (b) …."  Application Note 3 to Section 4A1.1(c) states "A diversionary disposition is counted only where there is a finding or admission of guilt in a judicial proceeding." Here, the PSR states that Rheiner pled guilty to this offense. Thus, even in the absence of the entry of a judgment, the USPO correctly assigned one criminal history point.

misdemeanor assault and drug charges. This history demonstrates a pattern of disregard for the law that is fully consistent with his behavior on January 6, when he aggressively confronted police officers on multiple occasions, obstructing their ability to uphold the law and emboldening other rioters.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the government's recommended sentence of incarceration. Rheiner's criminal conduct, joining a riot at the U.S. Capitol and interfering with law enforcement officers who were trying to maintain order and protect a fundamental institution of government, was the epitome of disrespect for the law. His reckless endangerment of a law enforcement officer lawfully performing his duty by pulling the officer down stairs, further displays this lack of respect for the law.   The recommended sentence reflects the seriousness of this conduct.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of the recommended sentence.

Rheiner's criminal history demonstrates a clear pattern of unlawful behavior that is consistent with his actions on January 6 at the Capitol. The government's recommended sentence would serve to disrupt this pattern and deter future crimes.

When Rheiner agreed to speak with the FBI agents who arrested him, he initially lied about his involvement in the events of January 6 until it became evident that the agents had reviewed video and were thus already aware of his involvement. For example, he initially told the agents that he was trying to help the police and did not enter the building. Later in the interview, after being told that the agents had reviewed video, he admitted he took the officer's riot shield and entered the building.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.   **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Moises Romero*, 21-cr-677-TSC, the defendant joined other rioters to push a temporary barrier against officers who were using it to prevent them from entering the Senate Wing Door. Like Rheiner, Romero briefly grabbed the edge of an officer's riot shield and ultimately succeeded in pushing back the police and opening the door. Like Rheiner, Romero pled guilty to violating Section 231(a)(3), and the calculation of his offense level included the 3-level enhancement for physical contact, resulting in a total offense level of 11, after acceptance of responsibility. Unlike Rheiner, however, Romero had a criminal history category of I, resulting an advisory range of 8-14 months. Judge Chutkan sentenced Romero to 12 months and 1 day. Here, Rheiner has a more serious criminal history, and so faces a higher guideline range, and a correspondingly higher sentence is warranted.

Similarly, in *United States. v. Ronnie Presley*, 21-cr-257-RDM, Presley disregarded police officers' commands to exit the Rotunda and resisted as a police officer used his baton to push him out. Like Rheiner, Presley briefly grabbed and pulled on a police officer's riot shield as the officer was attempting to push others out of the building. Like Rheiner, Presley pled guilty to violating Section 231(a)(3) and received the 3-level increase for physical contact, resulting in a total offense level of 11 after acceptance of responsibility. However, unlike Rheiner, Presley had a criminal history category of II and so faced an advisory range of 10-16 months. He was sentenced by Judge Moss to 12 months of incarceration. Again, Rheiner has a more serious criminal history, and so

faces a correspondingly greater guideline range. A sentence within that guideline range would not create any disparity.

While these are not exactly identical to the present case, they share salient features, and provide good comparisons to the relevant sentencing considerations in this case. Notably, while both Romero and Presley briefly grabbed an officer's riot shield, neither tore the shield from the officer's hands causing the officer to fall to the ground, as Rheiner did, and neither had as serious a criminal history category as that of Rheiner. Accordingly, the Government's recommended sentence of 21 months would not create an unwarranted sentencing disparity.

The government notes that in *United States. v. Johnson et al.*, 21-cr-00407-DLF this Court sentenced two defendants, a father and son, who pled guilty to violations of 18 U.S.C. § 231(a)(3) to prison terms of 30 days of incarceration and four months of incarceration respectively. Daryl Johnson and Daniel Johnson joined a group of other rioters who pushed past the police to open the East Rotunda doors from the inside so that more rioters outside could stream into the building. While the Johnsons were near the front of the crowd and helped to push through the officers to open the door, unlike Rheiner, they did not have direct physical contact with the officers. This is a significant distinction that affected the calculation of their offense level.

The agreed upon Guidelines offense level for both Johnsons, after acceptance of responsibility, was 8, which resulted in a final range of 0-6 months for Daryl Johnson, based on his criminal history category of I, and 4-10 months for Daniel Johnson, based on his criminal history category of II. Moreover, the Court noted that Daryl Johnson had no criminal background and an exemplary record. Here, by contrast, Rheiner's offense level is 13 due to a 3-level increase

because "the offense involved physical contact," and his total offense level was 11 after acceptance of responsibility. Additionally, Rheiner's criminal history category of IV significantly increased his guideline range. Accordingly, a sentence within the guideline range in this case would not create a disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rheiner must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Rheiner played in the riot on January 6.[9] Plea Agreement

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Rheiner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 10.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 21 months' incarceration, a term of supervised release of 3 years, restitution in the amount of $2,000, and a special assessment of $100.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Brian Morgan*
     Brian Morgan
     Assistant United States Attorney
     N.Y. Bar No. 4276804
     601 D Street NW
     Washington, D.C. 20530
     202-305-3717
     brian.morgan@usdoj.gov

</div>

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).