UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 22-cr-108 (DLF) |
| : | |
| NARAYANA RHEINER, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO REDUCE SENTENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Narayana Rheiner's Motion to Reduce Sentence. ECF Nos. 51 and 52. While the government concedes that the Amendment to U.S.S.G. § 4A1.1 applies, the Court should not exercise its discretion to reduce Rheiner's sentence due to the nature of his violent conduct on January 6, as well as his lack of remorse and minimization of his actions that day. Moreover, the Court already expressly varied Rheiner's sentence downward to treat his criminal history as if it were in Category III, thus incorporating the benefit of the status point amendment into his current sentence, and found a 15-month sentence to be proper under the § 3553(a) factors.

I.   **BACKGROUND**

Rheiner participated in the January 6, 2021 attack on the U.S. Capitol. While thousands of rioters stormed that Capitol that day, Rheiner's conduct stands out because he: (1) advanced to the front of rioters angrily confronting police on the Upper West Plaza; (2) encouraged other rioters to "push up" on the police line there; (3) ripped a riot shield out of an officer's hands, pulling the officer down a set of stairs, and knocking him to the ground; (4) proceeded past the crumbling police line and entered the Capitol building; (5) joined other rioters inside of the Capitol

1

intimidating police officers near the Rotunda; and (6) pushed into and threatened this second group of officers. While the government refers the Court to the Statement of the Offense, ECF No. 41, and its Sentencing Memorandum, ECF No. 34, for a full recounting of Rheiner's conduct, a few of his actions bear repeating.

At approximately 2:00 p.m. on January 6, Rheiner joined a mob of rioters at the Capitol's Upper West Plaza who were trying to advance past a line of Metropolitan Police Department ("MPD") Officers and toward the Capitol building. At approximately 2:04 p.m., Rheiner moved directly in front of the police line, waived at his fellow rioters, and encouraged them to "push up" on the police. Rheiner himself then pushed into police officers, who attempted to move him back, as shown in Images 1 and 2 below.



*Image 1: Screenshot of MPD Officer body-worn Camera ("BWC") showing Rheiner, circled in red, yelling to "push up" against the police line*



*Image 2: Screenshot of MPD Officer BWC showing Rheiner (wearing the red hat) yelling and pushing into the police line on the Upper West Plaza*

The MPD Officers Rheiner pushed into were using riot shields to defend themselves and to prevent rioters from advancing any further. Seeing this, Rheiner grabbed an officer's riot shield, engaged in a tug of war with the officer over the shield, and eventually dragged the officer down a set of stairs until the officer lay flat on his back and Rheiner took the shield. Images 3, 4, and 5 below depict Rheiner's assaultive conduct at this moment.



*Images 3, 4, and 5: A series of screenshots from MPD Officer BWC showing Rheiner, circled in red, grabbing an Officer's riot shield and dragging him down a set of stairs*

Rheiner made no effort to help the officer up after tossing him to the ground. Instead, Rheiner left the officer exposed to the mob and walked away with the riot shield, as shown below in Image 6.



*Image 6: Screenshot of MPD Officer BWC showing the Officer who Rheiner took the riot shied from lying on the ground, as Rheiner, circled in red, walks away carrying the shield*

After throwing the officer to the ground and stealing his riot shield, Rheiner did not leave the Capitol grounds. Instead, he continued advancing toward the Capitol building and entered it at approximately 2:44 p.m. Then, at approximately 2:50 p.m. near the Old Senate Chamber, Rheiner joined a group of rioters who were attempting to gain access to a hallway being blocked by another line of MPD officers. After the officers deployed chemical spray in an attempt to defend themselves and push the rioters back, Rheiner yelled at the officers, "You know how many times I've been sprayed today? That shit ain't nothing! … You sprayed me right in my face, but that ain't nothing." And instead of taking the clear cue from police that he should move back, Rheiner yelled "we're not backing up" and proceeded to push directly in front of the officers, as shown in Images 7 and 8.

4


*Image 7: Screenshot of MPD Officer BWC showing Rheiner, circled in red, moving into a police line and yelling at them inside of the Capitol building*


*Image 8: Screenshot from MPD Officer BWC showing Rheiner and an MPD Officer making physical contact as the Officer tries to push Rheiner back*

When officers commanded Rheiner to move back, he refused and threatened the police that they "just need to stand down, that's it." Rheiner left the Capitol building soon after this second physical encounter with MPD officers.

Rheiner was subsequently indicted on six charges and pled guilty to violating 18 U.S.C. § 231(a)(3), Civil Disorder. But throughout the investigation and pendency of his sentencing, Rheiner minimized his actions on January 6 and never expressed true remorse or understanding of his crimes.

For example, in his statement to FBI Agents after his arrest, Rheiner blamed his violent conduct on the West Plaza on Antifa protestors he claimed were dressed as Trump supporters and had egged him on; a clearly false statement. When asked if he had any interactions with officers inside of the Capitol, Rheiner falsely stated that he had only "talked to" an officer in the Rotunda before leaving the building through a window.

After he pled guilty, in his letter to the court, Rheiner made the following incredible statements:

> Prior to the incident, I was in a verbal exchange with one of the police organizers. I stepped up to the line and I was grabbed along with others who were being hit by nightsticks I tried to pull away that is when I was sprayed by Mace, and I proceed to grab the shield that eventually led to the police officer falling. I dropped the shield and retreated to where our militia forces were providing medical services to those of us on the front lines so that I could get water and neutralizer for the tear gas because I couldn't see.

ECF No. 37-1 at 1. Not only is this statement false, it blames the police for Rheiner's violent actions and shows no remorse, which the Court acknowledged at Rheiner's sentencing hearing. ECF No. 49, Sentc'g Hrg. Tr. 22:9-23:10. In the same letter, two sentences later, Rheiner also stated that "[a]s for my understanding, I thought that the Capitol building was open to the public," as though the rows of snow fencing laced with Area Closed signs, metal barricades, chemical spray floating in the air, and—at a minimum—multiple altercations with police were not a clear sign that the Capitol was indeed closed on January 6. ECF No. 37-1 at 1.

At sentencing, when asked by the Court if he had anything to say before sentence was imposed, Rheiner said nothing about his victims and did not express any understanding as to why his conduct was wrong. Instead, he only said that "I just want to say that I'm sorry for what I did. I'm trying my best to be a different person from this day forward." ECF No. 49, Sentc'g Hrg. Tr.

at 28:3-5. Notably, Rheiner's instant motion to reduce his sentence contains no statements of contrition. ECF No. 51.

Because of his lengthy criminal record, Rheiner fell into Criminal History Category IV, with seven criminal history points, including two status points added under the prior version of Section 4A1.1. PSR ¶ 47. However, the Court specifically varied Rheiner's sentence downward to treat the defendant as if he fell into Category III instead (*i.e.*, as if he had only 4-6 criminal history points). The Court stated that it would "vary a very modest amount from -- basically from the criminal history category of IV to III, which is 12 to 18 months … So another way of looking at that is it's a one-level reduction under the offense levels." *Id.* at 33:6-11. The Court then found "that a sentence of 15 months' incarceration is sufficient but not greater than necessary to fulfill the goals of punishment." *Id.* at 33:12-14.

## II.  RETROACTIVE APPLICATION OF AMENDMENT 821 PART A TO U.S.S.G. § 4A1.1

U.S.S.G. Amendment 821 Part A, which took effect on November 23, 2023, amended U.S.S.G. § 4A1.1, governing the calculation of a defendant's Criminal History Category. *See* U.S. Sentencing Commission, *2023 Amendments in Brief, Amendment # 821 – Criminal History* (last accessed April 28, 2024) https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf. The Amendment made three changes to Section 4A1.1: first, it struck subsection (d), which read "[a]dd 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status"; second, it redesignated the existing subsection (e) as subsection (d); and third, it inserted a new subsection (e), which states "[a]dd 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised

7

release, imprisonment, work release, or escape status." *Id.*; *see also* U.S.S.G. § 4A1.1.  Thus "before Amendment 821, a defendant with six or fewer criminal history points who committed the offense while under a criminal justice sentence, like any other defendant, would have received two extra criminal history points.  After Amendment 821, the same defendant would receive no extra points." *United States v. Otunyo*, 2024 WL 50975, at *2 (D.D.C. Jan. 4, 2024).

The Amendment to Section 4A1.1 may be applied retroactively to previously sentenced inmates, pursuant to U.S.S.G. § 1B1.10.  Such a reduction may occur as provided in 18 U.S.C. § 3582(c)(2), which states:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, a reduction pursuant to U.S.S.G. § 1B1.10 is not mandatory.  Instead, a "court *may* reduce the term of imprisonment, after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(2) (emphasis added); *see also* U.S.S.G. § 1B1.10 app. note 1(B)(i), (ii) (before reducing a defendant's sentence, the court must "consider the factors set forth in 18 U.S.C. § 3553(a) in determining … whether a reduction in the defendant's term of imprisonment is warranted" as well as "the extent of such a reduction."); *see also id.* Background ("The authorization of such a discretionary reduction ... does not entitle a defendant to a reduced term of imprisonment as a matter of right.").

A court considering a motion for a sentence reduction pursuant to the amended Section 4A1.1 follows a two-step process.  First, the court "'determin[es] the amended guideline range that would have been applicable to defendant had the relevant amendment been in effect at the time of the initial sentencing' by substituting only the amendments covered by U.S.S.G. § 1B1.10 and

'leav[ing] all other guideline application decisions unaffected.'" *Otunyo*, 2024 WL 50975, at *3. Then second, the court "consider[s] any applicable § 3553(a) factors and determine[s] whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case." *Id.*

In particular, the Court must consider public safety considerations, and may consider information regarding the post-sentencing conduct or situation of the defendant, whether positive or negative. *See, e.g., United States v. Darden*, 910 F.3d 1064, 1068 (8th Cir. 2018). Section 1B1.10 application note 1(B)(ii) directs that "[t]he court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment." Application note 1(B)(iii) further directs that "[t]he court may consider post-sentencing conduct of the defendant that occurred after the imposition of the original term of imprisonment." That means the court may, but is not required, to consider the defendant's post-sentencing rehabilitation, if any. *See United States v. Rodriguez-Rosado*, 909 F.3d 472, 481 (1st Cir. 2018); *United States v. Banderas*, 858 F.3d 1147, 1150 (8th Cir. 2017).

If the Court decides in its discretion to grant a reduction in sentence, it generally may not reduce the term of imprisonment to a term that is less than the minimum of the new guideline range. U.S.S.G. § 1B1.10(b)(2)(A). Thus, the Court may not reduce the sentence below the range provided by the amended guideline, here 12 months of imprisonment, and "in no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served." U.S.S.G. § 1B1.10(b)(2)(C).

### III. RHEINER'S SENTENCE SHOULD NOT BE REDUCED DUE TO THE NATURE OF HIS VIOLENT CONDUCT AND LACK OF REMORSE, AND HIS SENTENCE ALREADY INCORPORATED A LOWER CRIMINAL HISTORY CATEGORY

"The grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence. *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009). Accordingly, many courts have denied sentence reductions even in situations where guideline amendments lowered the sentencing ranges. *See, e.g.*, *United States v. Strand*, 21-cr-085 (CRC), ECF No. 150 at 7-8; *United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013).

It is true that application of the amended Section 4A1.1(e) reduces Rheiner's criminal history points from 7 to 5, taking him from Criminal History Category IV to Category III. However, the reduction *does not* move the previously imposed 15-month sentence outside of the applicable Guidelines range. That is, Rheiner's new Guidelines range is now 12-18 months imprisonment, rather than the 18-24 month range calculated at his sentencing, so his current sentence falls squarely in the middle of that range. And this 12-18 month range is what the Court used in pronouncing sentence when it expressly varied Rheiner's sentence downward to treat it as if his criminal history score fell in Category III: "the Court will vary a very modest amount from -- basically from the criminal history category of IV to III, which is 12 to 18 months, or alternatively, that would be -- *the Court's not going to impose a 12-month sentence*. It's going to impose a 15-month sentence. So another way of looking at that is it's a one-level reduction under the offense levels." ECF No. 49, Sentc'g Hrg. Tr. at 33:6-11 (emphasis added). Thus, Rheiner's sentence already effectively incorporated the reduction he would receive under the amended Section 4A1.1.

10

Moreover, when the Court sentenced the defendant, it applied the § 3553(a) factors and determined that a 15-month term was sufficient, but not greater than necessary, to comply with the statute's purposes. *Id.* at 33:12-15. The Court also expressly rejected pronouncing a 12-month sentence, *id.* at 33:9, and found that a 15-month term of imprisonment was warranted because:

> he was on the front line pushing against officers who were valiantly trying to defend the Capitol from attack. He pulled a riot shield from an officer, which caused that officer to fall to the ground and down steps, which put him in an extremely vulnerable, unsafe position with a mob around him. And all through this period, Mr. Rheiner himself was encouraging other rioters to help him breach the police line.
>
> His aggressive, combative actions didn't stop. Once he got inside the Capitol, he went to the Rotunda, and then he made his way to a private hallway that was blocked by police. Still, he tried to enter the hallway, and he remained in the Capitol even though officers sprayed him with pepper spray. He repeatedly refused to leave, saying things like "we're not backing up, I've been pepper sprayed all day, that does nothing" in so many words. So bottom line is he was aggressive not just on the front line but throughout that day, confrontational throughout that day in multiple settings.
>
> Unlike many January 6 offenders, Mr. Rheiner also has an extensive criminal history. Among other things, he was convicted of two burglaries, as well as multiple drug possession offenses that are not scorable under the guidelines. He was also on supervision in Maryland when he committed the instant offense, and he was sentenced to serve additional time for violating the terms of his probation.

*Id.* at 29:13-30:14.

None of the facts underlying the Court's application of the Section 3553(a) factors has changed. Looking at those facts, as noted by the Court, Rheiner engaged in violent assaultive conduct on January 6. He "does not," as the Court said, "fall within the group of the least culpable offenders here on January 6." *Id.* at 29: 13-14.

Next, as the Court acknowledged during his sentencing, Rheiner has a history of engaging in criminal and assaultive conduct. Specifically, Rheiner was arrested for second degree assault in 2007, 2013, and 2018, and was a defendant in a domestic violence incident filed in 2002. PSR

11

¶ 50-53.  While it is true that prosecutions for these assault arrests were declined, and thus do not count toward Rheiner's criminal history computation, the arrests still illuminate the defendant's history and characteristics.  And these assault issues are on top of the drug and burglary charges which do contribute to Rheiner's criminal history score.  PSR ¶ 36-45.  And to be clear, the fact that Rheiner committed his crimes while under a criminal justice sentence makes his history and characteristics different than otherwise similarly situated individuals who were not violating any terms of supervision when they committed crimes on January 6.  Put simply, Rheiner's history shows a lack of respect for the law.

Rheiner's minimization of his conduct also demonstrates a lack of respect for the law.  As discussed, rather than accepting culpability and acknowledging that his actions on January 6 interrupted the peaceful transition of power, Rheiner minimized his actions in a manner that is disingenuous at best, as the Court agreed during the Sentencing Hearing.  ECF No. 49, Sentc'g Hrg. Tr. 22:9-23:10.  Blaming Antifa and saying that based on a Bing search from July 2023 that he believed the Capitol had actually been open to the public on January 6 shows a troubling lack of remorse.  Even more troubling, Rheiner's letter to the court blames law enforcement for his decision to grab a riot shield and pull an officer down a set of steps.  Rheiner's lack of remorse also shows a potential to engage in such actions in the future.

In addition, the § 3553(a) factors counsel against a sentence reduction for the reason that the January 6 riot was a violent attack which threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers, causing serious bodily injury in many cases.  Every rioter, whether or not they personally engaged in violence or personally threatened violence,

contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

The main argument the defendant raises in support of his motion is that he has behaved well in prison thus far. ECF No. 51 at 6-7. The motion also references Rheiner's childhood trauma—which the Court already accounted for in his sentence—and that at the time he signed his plea deal, the initial Guidelines Range estimate was 8-14 months. *Id.* at 1-3. As to the latter point, as discussed at Sentencing and noted by the Court, Rheiner's plea deal stated that the initial range was an estimate and was "not binding." Plea Agreement at 4; *see also* ECF No. 49, Sent' Hrg. Tr. 32:17-22. Moreover, the government was "free to argue for a Criminal History Category different from that estimated…." Plea Agreement at 4. Thus the government never agreed that a sentence in the 8-14 month range was sufficient to punish the defendant for his assaultive conduct.

As to Rheiner's behavior while in prison, while his good behavior is commendable, it is expected of all prisoners, and Rheiner has not demonstrated that his behavior warrants any change in his sentence. To the contrary, it is notable that despite having had time to reflect on his offense, he still chooses not to express any remorse to the officers he threated and assaulted (outside of one single sentence in his letter to the court) or for his conduct writ large on January 6.

Thus, due to the § 3553(a) factors that the Court already determined called for a 15-month sentence, the unique nature of the January 6 riot, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that the Court should deny a sentence reduction and maintain its within-Guidelines sentence of 15 months of incarceration.

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny Rheiner's motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Matthew E. Vigeant*
Matthew E. Vigeant
Assistant United States Attorney
D.C. Bar No. 144722
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
(202) 252-2423
matthew.vigeant@usdoj.gov