United States District Court
For The District of Columbia

**United States of America,**

v.

**Narayana Rheiner,**

**Defendant.**

Case No. 22-cr-108 (DLF)

## Reply in Support of Motion to Reduce Sentence

Three months. This is the requested reduction that the government—despite acknowledging Mr. Rheiner's eligibility—spends 14 pages opposing. In so doing, it alternately downplays, dismisses, and misunderstands the factors that *have* changed since Mr. Rheiner's initial sentencing, and relies entirely on factors that this Court *already* knew of at the time of his initial sentencing. Its reliance is incorrect. Mr. Rheiner's retroactively reduced guidelines range and his postsentencing rehabilitation overwhelmingly support a 3-month reduction in sentence.

To start, Mr. Rheiner's reduced Guidelines range. The government simply elides the fact that, in determining the appropriate reduction here, this Court *must* consider the range that the Guidelines recommend—not the range that this Court varied to on the basis of reasons outside the Guidelines framework. *See, e.g.*, 18 U.S.C. § 3553(a)(4)(A); *Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) (the Guidelines range "remain[s] the foundation of federal sentencing decisions"). Indeed, the change in the Guidelines from 18-24 months to now 12-18 months is a material change to the § 3553(a) factors that alone warrants a sentence reduction. As the D.C. Circuit recognized, "[p]ractically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for judges and are likely to influence the sentences judges impose."

1

*United States v. Turner*, 548 F.3d 1094, 1099 (D.C. Cir. 2008). And because "anchoring effects influence our judgments, we cannot be confident that judges who begin" at a higher guidelines range "would end up reaching the same 'appropriate' sentence they would have reached" if they started from a lower guidelines range. *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring). The anchoring effect of the Guidelines not only influences judges, but all people, including prosecutors (and defense attorneys), who provide influential sentencing recommendations to the Court. *See United States v. Navarro*, 817 F.3d 494, 500 (7th Cir. 2016) ("[T]he Supreme Court long ago recognized the importance of the government's recommendation on the sentence imposed"); *United States v. Whitney*, 673 F.3d 965, 973 (9th Cir. 2012) (recognizing "the importance of the government's sentencing recommendation").

In this case, the sentencing hearing transcript demonstrates that the Guidelines had an especially strong anchoring effect. In this regard, the government entirely misses the point underscored by its changing stance from the lower range it believed applied when negotiating the plea deal and the higher range that ultimately applied at sentencing. It is not that the government was bound by the lower range (or the higher, for that matter); it is that these ranges clearly anchored its consideration of what an appropriate sentence would be. As this Court remarked, "the government was willing to plead him out to [a] maximum [of] 14 months"; in fact, the government "knew that it was scoring a certain way under the guidelines, and [] thought that that was a sufficient sentence for him." ECF No. 49, Sent'g Hr'g Trans. at 14:1-16. Yet upon learning that the Guidelines range was higher, its recommendation became tethered to that new, higher range. Once the range was established as 18 to 24 months, it requested a mid-range sentence of 21 months, notwithstanding that "[i]t's not like there was some offense that wasn't

2

known to the government that you were surprised by. You knew what it was. You knew what the conduct was." *Id.*; *see also id.* at 14:19-20 ("But did you not know his criminal history?"). In fact, the government itself relied on the anchoring effect of the Guidelines when explaining to a surprised Court why it would stick with a mid-range sentence here: "Part of it is a desire to be consistent in these cases, and the government is attempting to, based on an accurate calculation, sentencing guideline calculation, recommend sentences within that guideline, taking into account aggravating and mitigating factors. And so when the guidelines number changes . . . ." *Id.* at 15:16-21. The government's behavior in this case is a quintessential example of the anchoring effect that the Guidelines range plays at sentencing.

      Moreover, the anchoring effect lays bare the fault at the heart of the government's reliance on the range this Court reached only by varying. That variance range had nothing to do with the inapplicability of status points. It was because of "the nature of his earlier offenses, the extent to which he struggles with drug abuse issues, at least in part because of the trauma he's experienced, his recent efforts to really take advantage of the opportunities he's been given in connection with the Maryland offense after his revocation in that case and his -- you know, his efforts to get employment and housing so quickly[.]" Sent'g Hr'g Tr. at 32:25 to 33:6. This Court was anchored by the range of 18 to 24 months, was influenced by those factors to vary downwards to a range of 12 to 18 months, and ultimately sentenced Mr. Rheiner to 15 months. Had this Court been anchored to the retroactively reduced range of 12 to 18 months, and influenced by those same factors, it may very well have sentenced to Mr. Rheiner to a term below the 12-to-18 month range. It cannot do so today, but those factors certainly support a sentence at the bottom of that range of 12 months and 1 day.

It is noteworthy that in opposing this 3-month reduction, the government tries to rely on the same reasoning behind status points that the Sentencing Commission disavowed when amending their application. The government claims that "the fact that Rheiner committed his crimes while under a criminal justice sentence makes his history and characteristics different than otherwise similarly situated individuals who were not violating any terms of supervision when they committed crimes on January 6." Gov't Opp'n at 12. But this is *exactly* what the Commission said was not supported by data when it amended the application of status points: the fact of having committed the instant offense while under a criminal justice sentence does not meaningfully distinguish Mr. Rheiner from those who are otherwise similarly situated. *See* U.S.S.G., Supp. to App. C, Amendment 821, *Reason for Amendment, Status Points* (eff. Nov. 1, 2023); Notice, *Sentencing Guidelines for U.S. Courts*, U.S.S.C., 88 Fed. Reg. 2582540-01, 28273 (May 3, 2023); U.S. Sent'g Comm'n, *Revising Status Points*, at 18 (2022). This Court should reject the government's attempt to backdoor in the same unsupported reasons for relying on Mr. Rheiner's status at the time he committed the instant offense as was specifically disavowed by the Commission when amending status points.

The government argues this Court agreed at sentencing that Mr. Rheiner failed to accept responsibility, but the transcript speaks for itself. While the Court may have agreed Mr. Rheiner minimized some of his conduct, there is nothing in the record that shows he "didn't accept culpability" or "acknowledge that his actions interrupted the peaceful of transition of power" or that his remorse was "disingenuous at best." Gov't Opp'n at 12. The government's rhetoric here exceeds what the record supports. The government appears to forget that Mr. Rheiner "clearly demonstrated acceptance of responsibility" and received an offense level decrease on

4

that basis.  PSR ¶33; Statement of Reasons at 1 (adopting PSR without change).  Moreover, directly following Mr. Rheiner's statement that "I just want to say that I'm sorry for what I did. I'm trying my best to be a different person from this day forward[,]" this Court stated, "Well, that's good to hear, Mr. Rheiner."  Sent'g Hr'g Tr. 23:3-7.  The government appears to believe there is some magical combination of specific words an individual must intone to show remorse, but nowhere is that laid out in law or statute.  Instead, Mr. Rheiner was, and remains, "sorry for what [he] did" on January 6, remorse which he continues to demonstrate through rehabilitation. *See* U.S.S.G. § 3E1.1, cmt. n.1(G) (explicitly recognizing acceptance of responsibility through rehabilitation by listing "post-offense rehabilitative efforts (e.g., counseling or drug treatment)" as an "appropriate consideration[]" when applying the acceptance of responsibility Guideline).

As for Mr. Rheiner's postsentencing rehabilitation, the government brushes it off as if it is of no moment.  Gov't Opp'n at 13.  But "evidence of postsentencing rehabilitation" is "highly relevant to several of the § 3553(a) factors," including "the history and characteristics of the defendant," the "need for the sentence imposed" to serve the purposes of sentencing, and the court's "overarching duty" to "impose a sentence sufficient, but not greater than necessary" to comply with § 3553(a)(2).  *Pepper v. United States*, 562 U.S. 476, 491 (2011) (citing § 3553(a)(1), (a)(2), & (a)(2)(B)-(D)); *see also* U.S.S.G. § 1B1.10 cmt. n.1(B)(iii).

The government attempts to minimize Mr. Rheiner's perfect disciplinary record by claiming "good behavior" is "expected of all prisoners" Gov't Opp'n at 13, while at the same time ignoring that perfect behavior is not the norm, even at Mr. Rheiner's low security prison. *See Federal Prisoner Statistics Collected under the First Step Act, 2023*, DOJ Bureau of Statistics at 9 (Nov. 2023) (reporting that in 2022 alone, the most recent year for which data is available, FCI

5

Loretto had 244 infractions, almost a fifth of which were "greatest severity level"—typically reserved for murder, serious assaults, weapon possession, and other serious offenses).

In fact, "[i]t is not unusual for inmates to receive reprimands in the prison context," *United States v. Greene*, 561 F. Supp. 3d 1, 16 (D.D.C. 2021), given that "[e]ven the most rule-abiding among us would likely collect a few disciplinary infractions if subject to a host of rules governing the minutiae of daily life and monitored around-the-clock," *United States v. Brown*, No. 2:95-cr-66, 2024 WL 409062, at *9 (S.D. Ohio Feb. 2, 2024).  But Mr. Rheiner has none.  This belies the government's repeated claims that Mr. Rheiner continues to have "a lack of respect for the law," Gov't Opp'n at 12—Mr. Rheiner has followed each and every rule required of him inside the controlling prison environment filled with multiple trip wires.

Rather than any discipline, and as already noted, Mr. Rheiner has programmed to the fullest, completing the Nonresidential Drug Treatment Program; currently engaging in the RESOLVE Program; and taking numerous and varied classes.  *See* Ex. 1, BOP Records at 4, 5, & 7.  By committing himself so fully to rehabilitation in prison, including counseling and drug treatment, Mr. Rheiner underscores his remorse in the most consequential way he can: by working on his substance abuse and mental health so that he comes out of prison able to contribute meaningfully and positively to society.

In the end, the Government's opposition to a 3-month reduction appears to be rooted less in Mr. Rheiner's specific case and more in the "level of rigidity in these [January 6] cases that's not always just."  Sent'g Hr'g Tr. at 15:23-24.  The government has opposed every January 6

defendant's Amendment 821 motion, without a single exception.[1]  This is decidedly not the case in non-January 6 cases.[2]  While the majority of January 6 cases have been zero-point offenders, its opposition on § 3553(a) grounds has been verbatim in each.  *Compare* Gov't Opp'n at 12-13 ("In addition, the § 3553(a) factors counsel against a sentence reduction for the reason that the January 6 riot was a violent attack which threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers, causing serious bodily injury in many cases.  Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm."), *with* Gov't Opp'n at 16-17, ECF No. 63 (Jan. 30, 2024), *United States v. Hernandez*, No. 12-cr-445 (CCK) (verbatim); Gov't Opp'n at 10, ECF No. 165 (Feb. 9, 2024), *United States v. Hunter Seefried*, No. 21-cr-287-2 (TNM) (verbatim); Gov't Opp'n at 16, ECF No. 87 (Apr. 8, 2024), *United States v. Yoder*, No. 21-cr-505 (RCL) (verbatim).  This categorical opposition lays bare that the government is trying to supplant the Commission's reasoned judgment so that Amendment 821 is *not* fully retroactive to a select group of people—January 6 defendants only.

---

[1] To put the government's categorical policy in perspective, the government opposed a motion for a sentence reduction for a zero-point January 6 offender where only a **3-day reduction** was in dispute.  Judge Kollar-Kotelly ultimately granted the sentence reduction, demonstrating the unreasonableness of the government's position. *See United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 9 (D.D.C. Jan. 31, 2024) ("[T]he government has not proffered any convincing reason why the Court should not reduce Defendant's sentence, especially in this case when the only benefit Mr. Hernandez will receive is de minimis—a release from incarceration on February 1, 2024 as opposed to February 4, 2024").

[2] *See, e.g., United States v. Benson*, No. 22-cr-164 (RBW) (unopposed); *United States v. Damion Johnson*, No. 20-cr-100 (CJN) (unopposed); *United States v. Kent*, 20-cr-209 (CRC) (unopposed).

Mr. Rheiner, however, is both eligible for, and deserving of, a 3-month reduction in sentence. He respectfully asks this Court to grant this motion and reduce his sentence to 12 months and 1 day.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004
